## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RUSTY GOLD HYDRO-TESTERS, INC. | ) | Case No. 20-12629 - MER |
| dba Catamount Oilfield Services | ) | |
| EIN: 26-2676286 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

---

### DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF LIQUIDATION
---

### INTRODUCTION

This Disclosure Statement ("Disclosure Statement") has been prepared by Rusty Gold Hydro-Testers, Inc. ("Debtor" or "Rusty Gold"), Debtor and Debtor-in-Possession in Case Number 20-12629 - MER, to accompany Debtor's Plan of Liquidation ("Plan") which has been filed in the Debtor's Chapter 11 case. This Disclosure Statement is being provided to all creditors and equity interest holders of the Debtor. This Disclosure Statement is subject to final approval pursuant to 11 U.S.C. Section 1125 by the United States Bankruptcy Court for the District of Colorado as containing adequate information to enable creditors and interest holders to determine whether to accept the Debtor's Plan. The Court's approval of this Disclosure Statement does not constitute a decision on the merits of the Debtor's Plan. Issues related to the merits of the Plan and its confirmation will be the subject of a confirmation hearing, which is scheduled for _____ at _____ a.m. in **Courtroom C, at the Customs House, 721 19th Street, Denver, Colorado.**

**THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION. THE COMMISSION HAS SIMILARLY NOT REVIEWED THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT**

The Plan is the governing document or contract with creditors once it is confirmed by the Court. In the event of any inconsistencies between the Plan and this Disclosure Statement, the Plan supersedes the Disclosure Statement and will be the sole Court approved document that governs the post-confirmation relationship and agreements between the parties. Any terms used in this Disclosure Statement will have the same meaning as that term is defined in the Plan.

This Disclosure Statement is provided to you along with a copy of the Debtor's Plan and a Ballot to be used for voting on the Plan. Please complete the Ballot according to the instructions contained on the Ballot if you intend to vote for or against the Debtor's Plan. Each creditor or equity interest holder may vote on the Plan by completing the enclosed Ballot and returning it to counsel for the Debtor:

> David M. Rich, Esq.
> Buechler Law Office, L.L.C.
> 999 18th Street, Suite 1230-S
> Denver, CO 80202

This Ballot must be received by the appropriate counsel designated above by no later than **5:00 P.M. Mountain Time on _____, 2020**, which date has been set by the Court as the last day to vote on the Plan. Terms contained in this Disclosure Statement, which are defined in the Plan, have the same meaning as set forth in the definitional section of the Plan, Article I. **WARNING: IF YOU ARE A CREDITOR YOUR RIGHTS WILL BE IMPAIRED BY THE PLAN, unless otherwise indicated in the Plan.**

**Recommendation**. As discussed more fully below, the Debtors firmly believe that the Plan represents the best alternative for providing the maximum value for creditors. The Plan proposes a payment to unsecured creditors over time through the liquidation of the Debtors' assets to achieve the maximum recovery for its creditors. **Again, the Debtors strongly believe that confirmation of the Plan is in the best interests of creditors and recommends that all creditors entitled to vote on the Plan vote to accept the Plan**.

**Voting Requirements.** Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" under the Plan are entitled to vote to accept or reject the Plan. Classes of Claims and Interests that are not impaired are not entitled to vote and are deemed to have accepted the Plan. Article III of the Plan sets forth those Classes that are impaired or not impaired. Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules, and a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting.

**Voting Classes**. Each holder of an Allowed Claim in Class 4 shall be entitled to vote to accept or reject the Plan.

**Deemed Acceptance of Plan**. Unimpaired classes are conclusively presumed to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

**Deemed Rejection of Plan**. The Plan does not provide for any Class of creditors, other than Class 5 Equity Interests, that shall receive and retain nothing under the Plan. Classes that receive and retain nothing under the Plan are deemed to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code.

**One Vote per Holder.** If a holder of a Claim holds more than one Claim in any one Class, all Claims of such holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting for or against the Plan.

## OVERVIEW OF THE PLAN

The Debtor, through the Rusty Gold Liquidation Trust, will liquidate its assets with the proceeds used to fund the payments under the Plan. A Trustee will be appointed to assist in the sale of the assets and perform those duties set forth in the Rust Gold Liquidation Trust Agreement, which also includes engaging in litigation to recover from vendors money which is owed to the Debtor, and direct the payments to creditors as required under the Plan. Clint Gould ("Gould") is the majority owner of the Debtor and has extensive knowledge of the pipe market and the oil and gas industry and will assist the

Trustee in the sale of the assets. The Trust Assets to be sold will provide the money to fund the Plan which include (but is not limited to) pipe inventory, vehicles and equipment, collection of the Debtor's interest in the liquidation of Structural Steel of Colorado LLC, sale of real property, obtaining the Debtor's interest in the money deposited in the Court's registry in the Great Western Adversary Proceeding, recovery of accounts receivable, Avoidance Actions, and Causes of Actions.

The Plan provides for the orderly liquidation of assets of the Debtor under Chapter 11 of the Bankruptcy Code, in order to pay the creditors in this case.

## CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 of the United States Bankruptcy Code is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals. Chapter 11 allows a debtor to retain its assets during administration of its Chapter 11 case as a debtor-in-possession and following confirmation of a plan as a reorganized debtor. The Debtor's Plan is a liquating plan which calls for an orderly sale of its assets and payment to the creditors. There will be no reorganized Debtor in this Chapter 11 process. The Plan provides a means through which the Debtor will repay its obligations.

The Plan of Reorganization divides creditors into classes of similarly situated creditors. All creditors of the same Class are treated in a similar fashion. All Equity Interests are also classified and treated alike. Each Class of creditors or Equity Interest holders is either impaired or unimpaired under the Plan. A Class is unimpaired if the Plan leaves unaltered the legal, equitable and contractual rights to which each creditor in the class is entitled. Alternatively, a claimant is unimpaired if the Plan provides for the cure of a default and reinstatement of the maturity date of the claim as it existed prior to the default. The Bankruptcy Court established a Bar Date of June 15, 2020 for the filing of claims. The Plan provides that Claims and Interests of all Classes shall be allowed only if evidenced by a timely filed Proof of Claim or Interest or which otherwise appear in the Schedules filed by the Debtor and are not scheduled as disputed, contingent, or

4

unliquidated unless subsequently allowed by the Court. Creditors may check as to whether or not their claims have been scheduled as disputed, contingent, or unliquidated by reviewing the Schedules filed by the Debtors in the Bankruptcy Court for the District of Colorado. Alternatively, creditors may contact counsel for the Debtors directly in order to determine how they have been scheduled.

Chapter 11 does not require that each holder of a Claim against or Equity Interest in the Debtor to vote in favor of the Plan in order for the Court to confirm the Plan. The Plan, however, must be accepted by at least one impaired Class of Claims by a majority in number and two thirds in amount, without including insider acceptance, of those Claims of such Class actually voting on the Plan. Assuming one impaired Class votes to accept the Plan, it may be confirmed over its rejection by other Classes if the Court finds that the Plan does not discriminate unfairly and is fair and equitable, with respect to each Class of Claims or Interests that is impaired and has not accepted the Plan. Generally, a plan unfairly discriminates against a class if another class of equal priority will receive greater value under the plan than the nonaccepting class without reasonable justification. Under the Plan, only Class 4 "General Unsecured Claims" are impaired and can vote.

The fair and equitable requirement typically refers to the "absolute priority rule." The Bankruptcy Code requires that if "equity interest" holders retain an interest or receive anything under the Plan, then the unsecured creditor classes must either be paid the full value of their claims or vote to accept the Plan. Under the Plan, the Equity Interests will receive nothing.

If all Classes of Claims and Interests vote to accept the Plan, the Court may confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation. Among other things, Section 1129 requires that the Plan be in the best interest of the holders of Claims and Interests and be feasible through a showing that confirmation will not be followed by the need for further financial reorganization of the Debtor. The Debtor's Plan is a liquidating plan and there will be no reorganized Debtor afterwards.

5

### BACKGROUND AND EVENTS LEADING TO CHAPTER 11 FILING

The Debtor (referred to in this section as "Rusty Gold") was started in 2008 and was originally just a company that hydro tested pipe for structural integrity. Throughout the year of 2008, with high prices of oil, Rusty Gold was approached by an oil and gas exploration company and asked if it could sell them tubulars (pipes used in the drilling of oil and gas). With an ambition to grow, Rusty Gold took on that task. Clint Gould (at the time the salesman for the company) began calling people that sold pipe and found the material that was needed for the first 8-well project requested. This began the company on the road to selling pipes (now casings) to oil and gas producers.

In 2009 and 2010 the original customer passed along the word of Rusty Gold's success to three more clients and Rusty Gold became big enough to start buying directly from the mills. This changed the company. It allowed Rusty Gold to purchase direct and gain the extra margin for profit. Over the next few years, the company grew from doing $10 million a year in sales to $35 million in sales.

The market changed in 2013 as clients started the horizontal drilling boom and the clientele that Rusty Gold had serviced slowly started selling out to the larger competitors. This was a good thing and a bad thing for Rusty Gold. With the larger players drilling horizontals and with more than one drilling rig, it made the cash flow very intensive and the margin progressively got smaller and smaller. With the increased competition and less clientele, Rusty Gold transitioned as best it could and continued to grow with $70 million in sales. The years of 2016 and 2017 were good years for the company. But moving into 2018 and 2019 the market softened, and it became more and more of a competition for price from the oil and gas producers prospective. It was during this time that the CEO of Rusty Gold, Jay Scudder ("Scudder"), decided to hire a costly CFO as well as expand the sales staff to try and purchase market share through increased sales. This was not successful. Rusty Gold tried to reposition and go for smaller clients that the rest of the market would not be chasing and have a better chance to gain back margin. During the year of 2019 the

6

company's bank, PNC Bank, decided that they wanted to exit the oil and gas sector and concluded that service companies in the oil and gas sector would be the first type of client to be let go.  Scudder and the controller were unable to secure new funding from another bank and as PNC Bank began to exit from the oil and gas market, they forced Rusty Gold to use very costly subcontract auditors to monitor Rusty Gold's loan facility.  Scudder and the controller did not believe that the overhead costs through this year needed to be lowered but rather Rusty Gold just needed to get business that had a larger margin.  During this time Rusty Gold's clientele slowly was reduced to three clients yielding 90% of the sales to the company.  Even with the volumes of pipe sales, it moved the company into a vulnerable position with the bank asking Rusty Gold to find a new lender.

In January 2020 Rusty Gold's largest client, Great Western Operating Company LLC ("Great Western") went out for re-bid and the company lost the contract to a competitor. The new contract did not start until April 2020.  When PNC Bank learned that Rusty Gold lost its biggest client, it no longer would provide the company with the needed cash from the loan facility and instead through a prearranged lockbox procedure, swept and retained money remitted to Rusty Gold from its accounts receivable to pay down the loan which was about $9 Million.  The bank had a security interest in the assets of Rusty Gold and so there wasn't much that the company could do.  Also in January, Scudder resigned as the CEO and the operations of the company were turned over to Gould, whose main function for the company was previously in sales.  The current owners of Rusty Gold are Gould 94% interest and Scudder with 6% interest.

Rusty Gold had started to negotiate a payment plan with its pipe manufacturers and work back to a smaller yet healthier position.  This was almost accomplished, accept one vendor, TEDA TPCO, decided to file liens against the wells of Great Western.  This caused Great Western to withhold over $5.8 Million for pipes purchased from Rusty Gold. Without receiving the money owed by Great Western, the company could not fulfill its workout plan with the pipe manufacturers and was forced to file Chapter 11.

7

Two other events occurred during this time which were not helpful to Rusty Gold. First, the bookkeeper, Carrie Wickham, who had been with the company for ten years resigned weeks before the bankruptcy filing. Gould who has limited accounting experience was counting on Ms. Wickham to stay during the bankruptcy process. Her resignation left the company with only three employees when in the last year they had 15 employees. Second, the company got rid of a bad accounting software system, NAV which the Debtor had from September 2018 to April 2, 2020, and switched back to Quickbooks. Much of Rusty Gold's accounting information remains on its old system and is difficult to retrieve. These two events have made it difficult for Rusty Gold to obtain certain financial records and other business data.

Originally Rusty Gold planned to restructure to have much lower overhead and also transition the sales model from going direct to the end users and do more brokering of material with small packages of pipe at much higher profit margins. The goal was to obtain all or some of the funds withheld by Great Western and use those funds, together with money generated from inventory sales to pay the unsecured creditors at least the liquidation value of the company's assets plus more in order to pay back unsecured creditors. The Unsecured Creditors' Committee instead wanted Rusty Gold to liquidate its assets to pay the creditors. Rusty Gold agreed since administrative costs (especially from the Unsecured Creditors' Committee) would diminish the money obtained from sales which would have been generated for the creditors if Rusty Gold was a going concern. The cost of the fight did not make economic sense and so Rusty Gold agreed to a liquidating plan.

### ASSETS OF THE DEBTOR

The following are the major category of assets of the Debtor which will comprise the Trust Assets which will be sold or collected, which together with the cash, will be used to make the payments set forth in the Plan.

**Cash**. This is the cash the Debtor has in its Debtor-in-Possession accounts. The

Debtor-in-Possession account is used to pay the operating expenses of the Debtor as it sells the pipes it has in its inventory, as well as the payments for the administrative costs of the bankruptcy. The Debtor also has set up a Liquidation Account in which funds from the sale of equipment, collection of accounts receivable, and other assets sales are placed for payment to creditors under the Plan. Money in the Liquidation Account is not used for operating expenses. The Plan states that there will be $600,000 of cash in the Liquidation Account. The Debtor believes that this amount is conservative since there is currently $500,000 in the Liquidation Account and the Debtor anticipates putting in more money as it sells its inventory prior to confirmation. Any money left in the operating account as of the Effective Date will become property of the Trust and become Trust Cash to be used to make payments pursuant to the provisions of the Plan.

**Inventory**. As of October 1, 2020, the Debtor has a large inventory in steel pipes which has a liquidation value of about $675,000. The Debtor believes that in an orderly liquidation, the pipe inventory can be sold for more than its liquidation value. The Debtor is in the process of finding buyers, but the market is currently soft.

**Real Estate**. The Debtor owns 50 acres of leveled and constructed yard property located at 16185 County Road 20, Fort Morgan, Colorado which is free and clear of liens. It will be sold with the Net Proceeds to be included as Trust Cash and used to make payments pursuant to the provisions of the Plan. The property is currently being rented by A&M Threaders LLC, a company that is owned 40% by Scudder and 49% by Gould and 11% by Carrie Wickham. (Gould is not involved with the operations of A&M Threaders). Rent for the property is $6000.00 per month and rent is currently behind by three months. The property has an estimated value of $1,800,000.

**Equipment and vehicles**. The Debtor currently owns the following equipment and vehicles: Five pickup trucks, 16 flatbed semi-trailers, Four large forklifts, and two cars (2006 Honda CRV and a 2017 Ford Explorer). The Debtor is waiting on an evaluation by Dickensheet & Associates, Inc. but after three months of waiting, no report has been provided. The Debtor the estimates the value at $200,000. The Debtor owns a 2018 Ford

150 Truck which is secured by Ally Bank. The truck will either be surrendered to the secured creditor or Gould, who the guarantor of the obligation, will take possession and continue to make payments according to the loan documents. The estimated value of the truck based on Kelley Blue Book is $36,207 and the amount owing pursuant to Ally Bank's secured proof of claim is $51,038.78. The Debtor's records show that the current payoff figure is $44,174 and therefore there is no equity in the truck for the Trust Estate.

**Structural Steel of Colorado LLC**. The Debtor owns 50% of Structural Steel of Colorado LLC ("Structural Steel") with Ronnie P. Schwindt, Sr., Ron Schwindt, Jr. (collectively the "Schwindts") who own 10% and 40% respectively. Structural Steel was in the business of selling used pipes. In 2016 a disagreement occurred among the owners and a lawsuit was filed on January 1, 2013 regarding inter alia, the repayment of a $2,000,000 loan made to Structural Steel by Mr. Schwindt Sr. Mr. Schwindt Sr. was seeking repayment of the loan plus interest in the amount of $2,250,000. The parties reached a stipulation and executed a Settlement Agreement and General Release ("Settlement Agreement") on July 16, 2018. The Settlement Agreement requires Gould, as the manager of Structural Steel, to liquidate the company to pay Mr. Schwindt Sr's loan with the expenses of the liquidation paid by the Debtor. Once $2,250,000 is paid to Mr. Schwindt Sr., the balance of the liquidation proceeds will belong to the Debtor. Currently there is $250,000 remaining to be paid on the Settlement Agreement. The remaining asset left to be sold is real property known as the Road Q Property in Fort Morgan, Colorado. The Road Q Property is currently being rented to Muswell LLC for $2000 per month and the tenant is three months behind on rent. As of October 5, 2020, there is currently $40,000 from rent in a Structural Steel bank account at Bank of the West. The Road Q Property contains seven acres of land and an 8000 sq. ft. building which is listed for sale for $465,000. After the payment of the final payment of $250,000 to Mr. Schwindt Sr., the Debtor anticipates receiving Net Proceeds of approximately $200,000 which will become Trust Cash and distributed pursuant to the Plan. To fulfill the terms of the settlement and to receive the proceeds from the sale of the Road Q Property, the Debtor will assume the Settlement Agreement.

**Disputed Funds in the Registry of the Court**.  On May 7,2020 Great Western filed an adversary proceeding against the Debtor and pipe manufactures which sold pipes to the Debtor who then sold the pipes to Great Western.  The pipe manufactures who are currently defendants are:  Hyundai Steel USA, Inc., SeAH Steel America, Inc., Pyramid Tubular Products, LLC, Charter Pipe, LLC, TEDA TPCO America Corporation, and SDB Trade International, LP collectively "Pipe Suppliers."  Great Western deposited into the registry of the court $5,880,474.76 which was the money it withheld from the Debtor ("Disputed Funds").  The Pipe Suppliers are making a claim to this money based on the Colorado's General Mechanics' Lien Statute at C.R.S. §38-22-101 et seq., and/or Lien on Wells and Equipment C.R.S. §38-24-101 et seq. and each of the Pipe Suppliers have made claims to the Disputed Funds pursuant to the "Trust Fund Statute" at C.R.S. §38-22-127. The total amount claimed by the Pipe Suppliers under these statutes is approximately $3,855,022, with the balance of any Disputed Funds left in the registry of the court to become an asset of the Trust and become Trust Cash.  The Debtor estimates the money from the Disputed Funds going to the Trust ranges from approximately $2,251,689 to $5,880,475.  This amount may change if it can identify any other invoices which were not paid by Great Western and thus should be deposited into the registry of the court.

The adversary proceeding (Case Number 20-01138-MER) seeks to determine ownership of the Disputed Funds and alleges trust fund violations against the Debtor and Gould as well as asserting a constructive trust.  There are legal arguments as to whether the Pipe Suppliers are entitled to a lien under Colorado law and whether they can make a claim to the Disputed Funds under the Trust Fund Statute.   The Debtor is hoping to settle the claims to the Disputed Funds since a resolution through litigation will take two to three years and will be costly to litigate.

**Accounts Receivable**.  As of October 1, 2020, there is $1,323,377 in accounts receivable which are due to the Debtor.  The Debtor is attempting to collect these accounts and estimates that approximately $750,000 can be collected.  Any money collected either by the Debtor or by the Trust will be Trust Cash and used to make payments under the Plan.

**Post-Petition Payments to Creditors**.  Debtor inadvertently paid several creditors immediately after the filing of the bankruptcy petition, who should not have received the payment.  The Debtor paid these creditors approximately of $166,702.  This occurred when the Debtor thought the "due date" and not when the debt was incurred was the date in determining when payments are made in the ordinary course of business post filing.  The Unsecured Creditors' Committee volunteered to assist in the recapture of those funds but have not done so.  The Debtor and the Liquidating Trustee will pursue the recapture of these funds.

**Avoidance Actions**.  The Debtor believes there are Avoidance Actions for preference payments under Section 547 of the Bankruptcy Code.  Because of the uncertainty of litigation and collections, the Debtor is conservative in valuing the collection of post-petition payments and the Avoidance Actions at $200,000.  The Trust will pursue those claims.

The Debtor projects that the Trust Estate will consist of the assets set forth in the cart below, with the associated estimated values before any cost of sale of the items to be liquidated.  The values listed below are conservative and the Debtor believes that with an orderly liquidation, (as opposed to liquidation under Chapter 7), more proceeds can be produced for the Trust.

| Assets | Estimated Value |
|---|---|
| Cash from Liquidation Account | $600,000 |
| Disputed Funds | $2,251,689 to $5,880,475 |
| Inventory | $675,000 |
| Equipment | $200,000 |
| Real Property | $1,800,000 |
| Structural Steel Proceeds | $200,000 |
| Avoidance Actions | $200,000 |
| Collections and Post-Pet Payments Actions | $916,000 |
| TOTAL: | $6,842,689 to $10,471,475 |

12

## EVENTS DURING THE CHAPTER 11 CASE

During the Bankruptcy case, the Official Committee of Unsecured Creditors ("Unsecured Creditors' Committee") was formed.  Its members include:  TEDA TPCO, Hyundai Steel USA Inc., SeAH Steel America Inc., SDB Trade International LP, Pyramid Tubular Products LLC, HUSTEEL USA Inc., and Karst Industries Inc.  As permitted under the Bankruptcy Code, the Unsecured Creditor's Committee hired counsel, Peter Cal of Sherman & Howard LLC, and Peter Schulman of Shulman & Company, LLC as its accountant.  The fees of Mr. Cal and Mr. Schulman under the Bankruptcy Code are paid by the Debtor, and as shown from the chart in Section A(1) "Description of Liabilities and Claims" below, their fees represent the majority of the administrative expenses of the Debtor.

The Debtor continues to sell its pipe inventory and when there is money to be made for the Bankruptcy Estate, has purchased and then resold pipe.  The Debtor relinquished its downtown office lease and will entertain offers for its real property and equipment, with the proceeds after cost of sale to be placed into the Liquidation Account to become a Trust Asset.

The Debtor is the manager of Structural Steel and in charge of selling the remaining asset of that company, which is real property containing seven acres of land and an 8000 sq. ft. building located in Fort Morgan, Colorado.  This real estate is the last asset of that company and upon its sale, Structural Steel will be liquidated and dissolved.  The property is currently being rented to Muswell LLC which is owned solely by Jay Scudder (a minority interest owner of the Debtor).  Rent is $2000 per month which is being collected and held in a Structural Steel bank account.  Pursuant to a Settlement Agreement which provided for the liquidation of the company, once payment is made to Mr. Schwindt, Sr., the balance of the sale of the property proceeds (after payment of commissions and expenses) will become Trust Cash.  The property is currently listed for sale for $465,000.

The Debtor is working to settle the Great Western Adversary Proceeding with the Pipe Suppliers and Great Western. The Debtor believes that a fair and quick resolution is in the benefit of the pipe suppliers and the creditors. A swift resolution will reduce attorney fees and cost of all parties and allow for quicker distribution to creditors. The Debtor estimates that if the legal issues were to be tried in a court, that resolution of the case will not occur for two to three years, which will delay distribution to creditors under the Plan.

## DESCRIPTION OF LIABILITIES AND CLAIMS

A.   **Unclassified Claims**

  1.   **Administrative Claims**

Administrative Claims are those Claims for payment of an administrative expense of a kind specified in §503(b) or §1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to §507(a)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estate and operating the businesses of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) Professional Fees; (c) all fees and charges assessed against the Estates under 28 U.S.C. §1930 which include U.S. Trustee fees; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under §503(b) of the Bankruptcy Code.

The Debtor will make all payments required to be paid to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) until the case is closed, converted, or dismissed. All payments due to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) shall be paid on the Effective Date, and the U.S. Trustee shall thereafter be paid fees due on a quarterly basis until the case is closed, converted, or dismissed.

14

The largest portion of the Administrative Claims consists of professional fees of the Debtor and the professional fees of the Unsecured Creditors' Committee. The Debtor hired David M. Rich at the Buechler Law Office, L.L.C. as its main attorney and Daniel L. Swires, CPA as its accountant. Under the Bankruptcy Code, the Debtor is responsible for the payment of the professionals hired by the Unsecured Creditors' Committee. The Unsecured Creditor's Committee hired counsel, Peter Cal of Sherman & Howard LLC, and Peter Schulman of Shulman & Company, LLC as its accountant. The Debtor filed an interim compensation request with the Court to allow 80% of the monthly professional fees to be paid plus 100% of the costs, which the Court approved. The professionals are required to file a formal fee application every 120 days for approval of the interim fees paid and for approval of payment of the 20% holdback. The Debtor has been paying the professional fees current.

Debtor's counsel fees have been approved through July 31, 2020 by Court Order on September 16, 2020 and the Debtor's accountant fees have been approved through August 31, 2020 by Court Order on October 23, 2020. Below is a chart showing the fees of Debtor's counsel and accountant which includes the approved fees and invoices submitted to the Debtor through September 30, 2020.

The Unsecured Creditors' Committee professionals as of November 2, 2020 have not filed a fee application. Counsel for the Unsecured Creditors' Committee has submitted invoices for May to August 2020 and the accountant has submitted invoices for July through September 2020. The chart below shows the amount of the Unsecured Creditors' Committee professional fees invoices currently received by the Debtor.

| Debtor Professionals: | Approved Fees and Invoices: |
|---|---|
| Buechler Law Office LLC | $84,862.85 |
| Daniel L. Swires, CPA | $27,440.50 |

| Unsecured Creditors' Committee Professionals: | Invoices submitted to Debtor |
|---|---|
| Sherman & Howard LLC | $157,853.12 |
| Shulman & Company, LLC | $57,906.00 |

Administrative Claims that are allowed by the Court after the Effective Date of the Plan shall be paid upon allowance.

**2.  Tax Claims**

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. §507(a)(8).  The Internal Revenue Service has filed a priority tax claim for $504.93, which will the Debtor plans to pay on the Effective Day of the plan.

**B.      Classified Claims**

**Class 1:  Petrosmith Equipment**

Petrosmith Equipment filed a secured proof of claim for $251,535.15 which it claims is secured under Texas law by pipes currently in its possession under the Texas Constitution Article 16, Section 37, and Texas Property Code Section 70.001.  The Debtor believes the pipe in possession of Petrosmith Equipment is worth the amount of its secured claim.  The Debtor will surrender the pipe to satisfy in full Petrosmith Equipment's claim. This Class is unimpaired.

**Class 2:  Ally Bank**

Ally Bank is a creditor and filed a secured proof of claim for $51,038.78 which is secured by a 2018 F-150 truck with a current value of approximately $36,207.  The Debtor

believes the current payoff figure is $44,174, and therefore, there is no equity in the truck for the benefit of the Debtor or the Trust. Gould is a guarantor on the truck. The Debtor will surrender the truck or transfer the truck to Gould who will be responsible for satisfying this obligation. This Class in unimpaired.

### Class 3: Priority Non-Tax Claims

Priority Claims are defined in 11 U.S.C. § 507(a) of the Bankruptcy Code as any pre-petition Claim entitled to a priority payment excluding any Administrative Claim or Tax Claim. The Debtor does not believe it has any such claims but provides a classification if during the course of the bankruptcy, such a claim is found to exist. Any such claim will be paid 100% of the unpaid amount of such Allowed Priority Non-Tax Claim on the Effective Date or as soon thereafter as is practicable, payable solely from the Trust Cash.

### Class 4: General Unsecured Creditor Claims

The General Unsecured Creditors will be paid after the payment of all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims. The General Unsecured Creditor will share pro-rate from the proceeds of the liquidation of the Debtor's assets and will be paid from Trust Cash. Payments will be made after the objection to claims has expired.

The Pipe Suppliers filed secured proofs of claim with their claim secured by the Disputed Funds. Their total claims filed as secured are approximately $7,616,920. To the extent their claims are not satisfied by the payment from the Disputed Funds, they will have an unsecured claim. Charter Pipe and Pyramid Tubular Products filed an unsecured claim for $236,785.54 and $312,251.49 respectively, however they have also made claims to the Disputed Funds. The Debtor estimates that the Pipe Suppliers claims to the Disputed Funds (irrespective of how they classified their claim at the time of filing their proof of claim) are $3,855,021.58. Assuming that the Pipe Suppliers are paid from the Disputed Funds, then the Pipe Suppliers' remaining unsecured claim would be $3,761,898.60. The Debtor believes this number is low since the Debtor does not anticipate the Pipe Suppliers will receive the total amount they are seeking from the Disputed Funds and the amount

17

they are entitled to is the subject of the Great Western Adversary Proceeding and potential settlement.

Great Western filed an unsecured claim for $15,384,626.43 which is derivative of the claims of the Pipe Suppliers and is part of the Great Western Adversary Proceeding. The Debtor believes the claim of Great Western will be determined and satisfied by the Court's ruling in the Adversary Proceeding or through settlement, and as the Pipe Suppliers claims are paid, Great Western's claim will be reduced. Not including Great Western's claim or the claims of Charter Pipe and Pyramid Tubular Products which are counted with the Pipe Supplies claim to the Disputed Funds, the filed unsecured proofs of claim total approximately $3,596,629. Unsecured Creditors who did not file proofs of claim, have not been paid, and were not listed as disputed, contingent, or unliquidated total $950,686. Therefore the total unsecured claims range from $8,309,214 to $12,164,235 depending on how much the Pipe Suppliers claims are satisfied by the Disputed Funds and not counting Great Western's claim which will fluctuate with the claims of the Pipe Suppliers. Any of the Disputed Funds remaining after the payment of the Pipe Suppliers' claims, will be Trust Cash and paid to the General Unsecured Creditors.

**Class 5: Equity Interests**

All equity interests will be cancelled, and this Class will receive nothing under the Plan.

**C.    Leases and Executory Contracts**

The only contract which the Debtor will be assuming it the Settlement Agreement which settled the lawsuit regarding Structural Steel. The assumption of this Settlement Agreement will allow the remaining asset of Structural Steel, a piece of real property, to be sold. The real property is listed for sale for $465,000 and the Debtor anticipates netting from the sale approximately $200,000, which will become Trust Cash and used to make payments under the Plan.

18

All other contracts and leases including the lease for the downtown Denver office space and lease with A&M Threaders will be deemed rejected under Section 365 of the Bankruptcy Code.   The rejection of contract and lease claims will be treated as a Class 4 Claim.

### DESCRIPTION OF THE PLAN

The Debtor filed its Plan of Liquidation with United States Bankruptcy Court for the District of Colorado on October 26, 2020.  It is through the terms of this Plan that the claims of the creditors will be paid.

The Plan provides for a trust to be formed known as the Rusty Gold Liquidation Trust, which will acquire the assets of the Debtor and liquidate the assets in an orderly fashion.  The proceeds from the liquidation which is known as "Trust Cash" will be used to fund the payments under the Plan and pay the creditors' claims.  A Trustee will be appointed to assist in the sale, perform those duties set forth in the Rust Gold Liquidation Trust Agreement, and direct the payments to creditors as required under the Plan.  The Debtor has selected Simon Rodriguez as the Trustee with the approval of the Unsecured Creditors' Committee.  Mr. Rodriguez is a well know bankruptcy practitioner and has been a panel Chapter 7 Trustee for the District of Colorado since December 2003.

Gould will assist the Trustee in the sale of the assets given his knowledge of the assets to be sold, knowledge of the market, and likely purchasers in the pipe business and companies needing pipes.  The Trust Assets to be sold and accounts collected will provide the money to fund the Plan which include (but is not limited to) pipe inventory, vehicles and equipment, collection of the Debtor's interest in the liquidation of Structural Steel, sale of real property, obtaining the Debtor's interest in the money deposited in the Court's registry in the Great Western Adversary Proceeding, recovery of accounts receivable, Avoidance Actions, and Causes of Actions.

As of the Effective Date, the Debtor shall transfer and assign all of its rights, title, and interests in and to all of the Debtor's Property, which shall automatically vest in the

19

Trust free and clear of all Claims, Liens, encumbrances, charges, Equity Interests, and other interests, including any successor liability claims, and except for such Liens, charges and encumbrances set forth in the Plan.  In addition, the Trust will be vested with the power and standing to pursue causes of actions and avoidance actions such as under section 547 and 548 of the Bankruptcy Code.  Collections from any litigation after payment of costs such as attorney fees will become Trust Cash and used to make payments under the Plan.

## PLAN FEASIBILITY

The Debtor believes that the Plan, as proposed, is feasible.  The Plan offers creditors with the ability through a controlled liquidation of its assets (which are unique) the best prospect of receiving the highest dividend in the shortest amount of time.

## TAX CONSEQUENCE

The Debtor is not providing tax advice to creditors or equity interest holders.  Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation.  Generally, unsecured creditors should have no tax impact as a result of Plan confirmation.  The recovery of each creditor is payment on account of a debt and generally not taxable unless the creditor wrote off the debt against income in a prior year in which case income may have to be recognized.  Equity interest holders may have very complicated tax effects as a result of Plan confirmation.

## LIQUIDATION ANALYSIS UNDER CHAPTER 7

The principal alternative to the liquidation under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code.  Chapter 7 requires the liquidation of the Debtor's assets by a Trustee who is appointed by the United States Trustee's office.  In a Chapter 7 case, the Chapter 7 Trustee would take over control of the assets.  The assets

would be liquidated, and the proceeds distributed to creditors in the order of their priorities.  A Chapter 7 Trustee earns a fee or commission on the distributions made to creditors.  Because of the value of the assets which would be turned over to a Chapter 7 Trustee and the proceeds paid to creditors after administrative costs are paid, a Chapter 7 Trustee may be awarded under Section 326 of the Bankruptcy Code fees ranging from $228,531 to $337,144.  This does not include the cost of hiring attorneys and accountants and other professionals to assist in the liquidation of the assets.  The Debtor does not believe that the Trustee's fees under its Plan, on an hourly basis, will be more than the Chapter 7 Trustee statutory fee.  The Debtor believes a liquidating trust as proposed under the Plan is a cheaper and more efficient way to liquidate the Debtor's Assets, and provide more money to the creditors more quickly.

The Debtor believes that a controlled sale of the Debtor's assets under the guidance of a liquidating trustee, and assisted by Gould, will generate more money than if the assets were sold at "fire sale".  The potential decrease in liquidation proceeds in a Chapter 7 and the extra cost of a Chapter 7 Trustee will reduce the dividends to creditors under a Chapter 7 rather than under the proposed Plan in a Chapter 11.

DATED: November 2, 2020

RUSTY GOLD HYDRO-TESTERS, INC.

By: */s/ Clint Gould*
    Clint Gould, President

BUECHLER LAW OFFICE, L.**L.C.**
David M. Rich #15211
999 18th Street, Suite 1230-S
Denver, Colorado 80202
720-381-0045 / 720-381-0382 FAX
Dave@KJBlawoffice.com

*Attorneys for Rusty Gold Hydro-Testers, Inc.*